59 CCPA

**Walter L. REINHART, Appellant,**

v.

**David L. COURSEN and Frank A. Loving, Appellee.**

**Patent Appeal No. 8593.**

United States Court of Customs and Patent Appeals.

May 4, 1972.

Roger R. Horton, Wilmington, Del., attorney of record, for appellant. Dexter N. Shaw, Philadelphia, Pa., William A. Smith, Jr., Washington, D. C., Richard H. Bradford, Arlington, Va., of counsel.

A. Newton Huff, Wilmington, Del., attorney of record, for appellee. G. A. Hapka, Arlington, Va., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RAO, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to appellees Coursen et al. (Coursen). Reinhart is involved through his application serial No. 544,579, ('579) filed November 2, 1955, which is a continuation-in-part of application serial No. 458,973, ('973) filed September 28, 1954. Coursen is involved through U. S. patent No. 3,101,288, issued August 20, 1963, on application serial No. 653,533, ('533) filed April 18, 1957, which in turn is a continuation-in-part of application serial No. 450,271, ('271) filed August 16, 1954.

## THE INVENTION

The following description of the invention from appellant's brief is sufficient:

> The invention involved in the present interference is a gelatin dynamite composition, conventional in nature except for the inclusion of very minute (flour-like in size) hollow resinous plastic pellets * * *. The pellets used by both parties in their experimental work * * * were "Microballoons" manufactured by the Bakelite Division of Union Carbide * *.

The function of the "Microballoons" is to provide a gelatin dynamite which retains its sensitivity to initiation and propagation under water pressure and on aging.

The interference involves three counts, the first of which reads as follows:

> 1. A gelatin dynamite composition comprising about from 20 to 80% by weight of nitroglycerin, about from 0.5 to 6% by weight of nitrocellulose, about from 10 to 70% by weight of an inorganic oxidizing salt, and about from 0.25 to 4% by weight of the entire composition of a water and nitroglycerin insoluble polymerized thermosetting resin selected from the group consisting of urea-formaldehyde and phenol-formaldehyde resins in the form of thin-walled, hollow, spherical balloons, said balloons having a bulk density of less than about 0.3 gram/cc. and a diameter between 2 and 360 microns, said gelatin dynamite composition having a bulk density of greater than 1.

The second and third counts are limited to urea-formaldehyde balloons. The third count additionally recites the presence of a combustible material selected from a list of such materials as starch and bagasse pith.

## BACKGROUND

This is the second interference between these parties on this general subject matter. The first was declared in June of 1958 between Reinhart '579, Coursen '533, and an application of another person who is not a party to the instant appeal. The count in the first interference was broader in many respects than the counts presently under consideration. During the course of the first interference Coursen moved to shift the burden of proof, seeking the benefit of the filing date of the '271 application, which had been listed in Coursen's preliminary statement. The motion was denied as being belatedly filed without a verified showing as to the reasons for delay. The motion was thereafter renewed. It was again denied, "without prejudice to Coursen['s]

right to rely on the application in question at final hearing." The first interference was subsequently dissolved on the basis that the count was unpatentable over certain prior art. Thus throughout that interference, Reinhart stood in the position of senior party.

The Coursen patent was issued August 20, 1963. It contains three claims, which correspond to the present counts. This second interference was declared in July of 1964. On January 7, 1965, Reinhart filed a motion for judgment on the ground that Coursen was estopped to contest priority of these counts for failure to contest them in the previous interference. On the same day, Coursen filed a motion to shift the burden of proof, contending that he should be given the effective filing date of application '271. The board ultimately denied Reinhart's motion for judgment and sustained the examiner's action granting Coursen's motion to shift. The view we take of the case renders it unnecessary to consider Reinhart's motion for judgment and certain other arguments raised by the parties.

## THE BOARD'S DECISION

The board held that Reinhart was entitled to a date of February 12, 1954, for conception of count 1. Coursen's conception was considered to be on February 19, 1954. Priority was awarded to Coursen, on the basis that Reinhart had not shown reasonable diligence during the period from just prior to Coursen's conception to his own reduction to practice. The circumstances surrounding Reinhart's reduction to practice as shown by the evidence are adequately set out in the Board's findings of fact:

> 4. On November 25, 1953, after seeing a news item relating to Bakelite Microballoons, Reinhart orally disclosed to Smith and Rolland "the idea of including microballoons in gelatin dynamite;" Reinhart thereafter requested the Assistant Purchasing Agent at the Reynolds Experimental Laboratory of the Atlas Powder Company (Reinhart's employer) to secure some of the above product "for our ex-

amination." Reinhart Exhibit 3 is a letter dated January 13, 1954 from Kalmbacher concerning a sample of microballoons on which Reinhart wrote "Joe . . . Suitable for Peetrogel???" (Joe referring to Joseph Smith, Jr.). The term "Peetrogel" referred to an Atlas gelatin dynamite sold under the trademark "Petrogel" (Reinhart Exhibit 4). Shortly after January 13, 1954 Smith received the above letter (Reinhart Exhibit 3) bearing the handwritten notation by Reinhart; a sample of microballoons was received and on February 12, 1954 Smith instructed the laboratory mix house crew to make preliminary 1000 grain mixes of gelatin dynamite to each of the formulae written by Smith at that time on Atlas forms 1573 (Mix House Cards). The compositions were identified as 1097, 1097A and 1097B, those indicated on cards 1097A and 1097B (Reinhart Exhibits 8 and 9) are within the scope of Count 1. Smith also requested the above group to prepare an 8000 grain quantity of mix 1097B, identified as mix 1097B-1. Mixes 1097 and 1097A were discarded and mixes 1097B and 1097B-1 were placed in storage. On March 1, 1954 cartridges of mix 1097 B-1 were placed in a bomb under pressure, allowed to rest for 24 hours and then (on March 2, 1954) exploded. It was recorded in a "Butcher Book" (Reinhart Exhibit 11) that complete detonation had taken place. On April 15, 1954 Smith examined samples of mix 1097B-1 and recorded the results of his examinations in his personal "Butcher Book" (Reinhart Exhibit 13). On April 23, 1954 Reaman and Kern made velocity determinations on two cartridges of 1097B, using a "Dantriche" method. Another bomb prepared from mix 1097B-1 was detonated on August 25, 1954 (Reinhart Exhibits 16 and 17).

5. The record shows that at various times in the period from April 15, 1954 until January 7, 1955 further mixes of gelatin dynamite meeting the terms of Count 1 were prepared on behalf of Reinhart and subjected to "bomb" and velocity tests.

6. Smith stated that at RXL (Reynolds Experimental Laboratories of the Atlas Chemical Industries, Inc.) where the work on behalf of Reinhart was carried out, gelatin dynamite mixes were always aged before testing and "are not shot on the day of manufacture" and this period of ageing may be two weeks or longer although shorter periods may be used. The record shows that certain mixes (1114-B and 1114-C, Reinhart Exhibits 65 and 66) were subjected to explosion tests four days after their preparation.

Based on these facts, the board concluded:

In view of the circumstances here we are of the opinion that Reinhart was not reasonably diligent during the period from just prior to the Coursen et al. conception (February 19, 1954) and his own reduction to practice nor any adequate excuse for the lack of diligence given. The only reason offered by Reinhart for the lack of activity in this period is that the period was occupied with the storage of the product and that "there is . . . no way to test ageing properties without ageing." It is noted that Count 1 includes no limitation relating to ageing and the first Reinhart application makes no mention of the effect of the balloons on the storage stability. Further, the record shows that it was not the practice for Reinhart and his co-workers to necessarily store the composition two weeks or more prior to testing the composition but the record shows that the period between formulation and explosion testing was as short as four days in some instances.

The board also held that Coursen was entitled to the benefit of the filing date of the '271 application:

We are * * * of the view that the disclosure in the prior Coursen

et al. application provides adequate basis for the counts. The fact that during prosecution of that application claims which were broader than the counts here were rejected as based upon an incomplete disclosure is not controlling. There was no final adjudication of this rejection by the Board of Appeals or any court. The prior application clearly discloses compositions meeting the terms of the counts. The selection of a particular resin for the balloons is considered well within the skill of the art. Coursen et al. were properly accorded the benefit of the filing date of the above mentioned prior application. * * *

Since with respect to counts 2 and 3 Reinhart had alleged no dates prior to the filing date of application '271, the board awarded priority to Coursen as to those counts.

### OPINION

#### 1. Priority: Count 1

■ We find that the board's holding that Reinhart was not reasonably diligent during the critical period is contrary to the weight of the evidence. It is clear from this record that *both* parties considered stability on ageing to be a very important property of the products sought. Both parties did extensive testing of the effects of ageing on their compositions. Mr. Joseph Smith, Jr., who was in charge of all dynamite research activity at the Reynolds Experimental Laboratory, stated:

Gelatin dynamite alters its explosive properties with age and for this reason gelatin dynamite mixes at RXL are always aged before testing for their functioning ability and are not shot on the day of manufacture. This was the practice when Mr. Smith came to RXL and has been the practice all during his tenure at the laboratory.

When suitability for seismograph work and underwater work is to be judged, gelatin dynamites are preferably aged two week[s] or longer, although periods as little as one week may be employed when formulas do not differ greatly from those of known products before testing. Also, such dynamites are tested under pressure.

It appears that Mr. Smith, with assistance from Mr. Reinhart and another, supervised the preparation, storing and testing of the mixes containing microballoons. The actions taken by Mr. Smith during the period prior to the filing of the first Reinhart application are fully consistent with his above statements. They are also fully consistent with the statement of Mr. Smith that the storage of the mixes prepared on February 12th was "deliberately designed" to test the effect of ageing on the product.

With regard to the board's statement that "count 1 includes no limitation relating to ageing," wo do not think that that consideration is pertinent here. Reinhart is neither trying to add a limitation to the count which isn't there nor trying to establish support for a nonexistent limitation. He is merely trying to show that the pursuit of the invention was being carried on with reasonable diligence during the period from the time his first composition was made to the time it was tested. The board also noted that the first Reinhart application did not mention the effect of the microballoons on storage stability. While this fact gives some indication that Reinhart did not consider the ageing properties of his composition to be important, we find that that indication is overwhelmingly rebutted by the rest of the evidence in the case. Finally, the board's statement that "the record shows that it was not the practice for Reinhart and his coworkers to necessarily store the composition two weeks or more prior to testing the composition * * *" is not inconsistent with the Smith statements quoted above. It is true that a series of mixes was prepared in late June of 1954, some of which had waiting periods between their date of preparation and the date they were first tested of as short as four days. However, that series was more thoroughly tested for ageing characteristics than that short initial waiting period would indicate since further

testing on those mixes was performed as late as six months after the date of preparation. There were seven other dates in 1954 on which a series of mixes was made. None of these other mixes were tested sooner than seven days after their date of preparation and most were stored considerably longer than that. It would appear therefore that the period of two weeks for which Reinhart waited before testing his first composition was a reasonable one.

Thus the record contains a statement under oath that the storage of the mixes during the period focused on by the board was for the purpose of testing the properties of the composition after ageing. The statement is supported by the actions of Reinhart and his co-workers, and by the statements made on behalf of both parties which support the conclusion that it was reasonable to age the compositions before testing them. On this record, we are of the opinion that Reinhart has established reasonable diligence between February 12, 1954 and March 1 or 2, 1954, when the explosion tests were performed.

### 2. Coursen's Motion to Shift: Counts 2 and 3.

■ Appellant contends that Coursen is not entitled to the date of his earlier filed application because it does not provide adequate basis for the counts in issue. Reinhart argues that:

> The invention related to the use of a new and theretofore unavailable product. Yet the first Coursen et al. disclosure would give the art no teaching which would permit it either to know how to prepare the product or to know how it might otherwise be obtained. That "fatal" defect in the disclosure was not remedied until the second Coursen et al. application was filed long after Reinhart's first and second filings.

Coursen's application '271 generally describes the physical characteristics of the resin balloons, and states that:

> The resin balloons used in the examples were prepared from a phenol-formaldehyde resin by the use of a blowing agent. Other synthetic non-porous thermosetting resins such as the urea-formaldehyde resins, and the melamine resins can also be prepared in this form and used in the present invention. * * *

The application goes no further in describing how the resin balloons can be made, nor is a commercial source of the balloons referred to. Coursen argues that the resin balloons referred to in the earlier application were "standard articles of commerce at the time Coursen et al. filed its parent application." In support of that contention, Coursen relies on the article in the December 1953 *Chemical and Engineering News* referred to in the board's opinion quoted *supra*, and on a trademark for MICROBALLOONS to Standard Oil Company, which states that the first use in commerce was on September 11, 1950.

We agree with appellant that Coursen is not entitled to the filing date of application '271, because that application fails to support counts 2 and 3 in the manner required by 35 U.S.C. § 112, first paragraph. It must be kept in mind that counts 2 and 3 are restricted to urea-formaldehyde balloons. Thus the *Chemical and Engineering News* article, which mentions only "microscopic balloons of Bakelite phenolic resin," and the MICROBALLOONS trademark registration, which does not state what resins the product might be made of, are insufficient to establish that urea-formaldehyde "microballoons" were even commercially available at the time '271 was filed, much less that the product was a "standard article of commerce." Other evidence referred to by appellants suggests that even phenolic "microballoons" were not "standard articles of commerce" at that time. Further, there is nothing in the record that would support a conclusion that the statement that the balloons could be prepared from resins "by the use of a blowing agent" would have been sufficient to apprise one skilled in the art how the balloons could actually be made. Under these

circumstances, we are unable to hold that application '271 disclosed the invention of counts 2 and 3 "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * to make and use the same * * *." 35 U.S.C. § 112.

In summary, we find with respect to count 1, that the party Reinhart is entitled to priority, because he was the first to conceive and was reasonably diligent from a time just prior to Coursen's conception to Reinhart's actual reduction to practice. With respect to counts 2 and 3, we find that Coursen is not entitled to the filing date of application '271 under 35 U.S.C. § 120 because that application failed to disclose the inventions of those counts in the manner required by 35 U.S.C. § 112, and thus Reinhart is entitled to an award of priority on the basis of his constructive reduction to practice on the November 2, 1955 filing date of his '579 application.

For the reasons stated above, the decision of the Board of Patent Interferences is reversed.

Reversed.